Good morning, Your Honors. Russ Juckett representing Joe Cooper in this matter. The matter comes before you on whether a reset plan can be obtained and get reimbursement from an employee who has not made whole under his tort claim. The relief sought, we're asking the court to reinstate the case back in the District Court and whether on the basis that Premera, in our belief, has refused to waive its segregated claim because we believe our client has, in fact, not made whole. The roadmap on this matter, Your Honors, deal with the Premera plan itself and the four areas in which you can get reinforcement or reimbursement. Those three areas, just as an overview under the plan, is under the claim of U.M. or uninsured or underinsured motorist provision which allows reimbursement only in excess of all recoveries and only then, again, if the person was not made whole. Well, doesn't the plan at page 24 say, plain plan language says, benefits aren't available under this plan when coverage is available through personal injury protection? Isn't that what the plan says? Absolutely, Your Honor. And so there was coverage available under personal injury protection, wasn't there? Eventually, nine months or almost a year after my client was injured and after he had received the majority or $19,000 worth of medical treatment. But nonetheless, yes, there was coverage available under personal injury protection and therefore the plan language would suggest that it isn't available under the plan. What it suggests, Your Honor, is that yes, the plan language says that if PIP is covered, is there, then you have to utilize your PIP. But in this particular case, if you look back in time, is that we submitted our materials, PIP was rejected, we went to the plan, plan paid under it, and then plan does not tell us how to reimburse them at all. It's just a one-liner that you're reading from from page 24 of that plan. It says if these benefits are available, plan doesn't apply. It doesn't address how you reimburse. Well, but they asked for the reimbursement under the plan because the benefits weren't available. They didn't only ask. They didn't ask that way. They didn't say, give me back my money. They say, well, you know, if you'll show us some proof, if you'll show us what balance is left out of the $10,000, we won't get that. If you'll do anything to show us what we need to do so we don't take our benefits, we won't take our 10. And that's where we went to the plan and said, look, gentlemen, before you try to take this back, let's look at the plan. Where does it say you're reimbursable? You're reimbursable under UIM or you're reimbursable under the right of recovery. But again, each of those paragraphs... Well, but UIM doesn't have anything to do with personal injury protection. I found your argument somewhat... I read through the coverage. I tried to find where UIM could relate back, where it could have anything to do with it, UIM or UIM. It doesn't even have anything to do with where we are here. It has to do with that kind of protection, which you also had and which you also went and got. Yes. And therefore... And they didn't ask for any of that back. All they asked back was what they paid as benefits, which you got back under personal injury protection. And then we addressed it with them and said, look, we have not been made whole. You're not entitled to it. Where's the made whole? Where in this policy does it say you need to be made whole in order to not get benefits that you should not have got because it was covered by personal injury protection? There's nothing... Where do I go for that language? Where you go is you have to read the context of all four corners of the contract. And it doesn't... First of all, if you address the action as a PIP coverage and how you reimburse, there's no indication. So then you read other aspects of the policy, other aspects of the policy of the UIM and also the right of recovery. Well, I'm more than happy to give you some help against the insurance company when there's an ambiguity or when there's something that I can come to. But I look at the plan language and I say they're not available under the plan when there's personal injury protection. I look at all the other areas where I might get around this. Did you argue to the district court that this language was ambiguous under this policy? Well, I argued that it didn't give direction and for that reason it was ambiguous. Did you say ambiguous because the district court didn't talk about ambiguity? No. It seemed to me you were arguing this is clear and unambiguous. Interpret the contract, Judge. And that's in essence what I said, Your Honor. I argued a declaratory judgment type of a reaction because if you look at the contract, you look where you go, there's no roadmaps to tell you how to go. In fact, if you look at my correspondence, which you have and you're quoting from, from 166 to 176, I'm writing to them at all times saying, look, we've collected this money. We think that there's an issue with you, insurance company. We think that we have not been made whole. Give us a review. Give us that opportunity to discuss this with us. They say car block. No, pay us back. But there's nothing in the contract in and of itself that indicates that we have to indicate how PIP is spent. Just the comment says pay us back. Well, frankly, they didn't have to give you any opportunity to say how PIP was spent. They didn't have to do any of that. They were just trying to help you. But on this coverage on the plan itself, what they did or what they didn't do is not important. What is important is I have to read a contract and then determine what the deal is. And I'm trying to figure out in that contract, if I want to help you, what language do I go to? Well, you can go to two paragraphs that talk about what to do with excess. You know, the right of recovery says amounts paid that exceed. Okay? That gets us to the question of is there anything that exceeds. Our position is no, he's not been made full, so therefore the contract cannot collect. Well, but you're under UIM now. No, no, sir. I'm at page 247. Tell me where you're going under the plan. 247, page ER247, the right of recovery. This is, again, and again, it talks about when there's benefits that have been provided, as well as UIM talks about benefits that have been provided. It's not unlike the Barnes case that I quoted, because the Barnes case, they didn't pay anything. In this case, they paid and want to recover post-accident by about a year. And for that reason, we're looking for language that says where do you have to, why do I have to return this money to you when my client has not been made totally whole? We argued $287,000 was his claim or his damages. Well, we've shown, in fact, that he had bills over $72,000. By their actions of taking these monies back, my client then owes the $72,000, Your Honor, in addition that what is he's already paid $16,000. He has paid excessively towards the medical bills that they said that you're supposed to pay back. And that was in his declaration, that I paid $16,000. We indicated that they had taken back more than $10,000 from Everett Clinic. They took back $15,600. $16,000 he paid was including an interest. So they said pay me back, but when they went out and took from the providers, they took back more than, in fact, they're entitled to. You're arguing that I shouldn't have to give it back when I haven't been made whole. And they said, oh, okay, if you took that $10,000 and paid it for medical damages, show us the receipt or the bill or something, and then we won't go after it. But that's not what happened. Well, we did almost exactly what they did, Your Honor. They give us the benefits and then want to take it back. They take the benefits back, and we pay $16,000 and said, hey, you shouldn't take back anything else because you've already got $16,000 from us that we paid to Everett Clinic, which is one of the providers. There's additional medical bills on top of that. So does one right make two rights? What they got back was $10,000. Excuse me, Your Honor? What they got back was $10,000. They got $16,000. Well, they got back more. My client paid $16,000 on a $15,000 take back. They got more than $10,000. They got more by $5,000 based on the facts of the law. The only reason they got more, you would suggest that, is you have to pay more. There's nothing in this record that say they took $15,000 from the providers. They only took $10,000. They said they took $10,000. That's always in the record. No, Your Honor, the record that reflects the one that Joe Cooper's declaration... Where is that? I didn't focus on that, I guess. It's... That part of the record, Your Honor, would be under Penny Cox's declaration, and I believe I had that right there. There it is. It'll be found on page 13, Your Honor, declaration of Penny Cox, where she reflected 13 and 14, Your Honor. You'll find the declaration wherein she went in, worked with every clinic, and the amount that was taken back on his account was $15,000-plus, Your Honor. That's where you'll find it in the record. As I understood it, the amount you might have to pay might be more because they work out a deal with particular providers to take less, but you paying it on your own might be more, and therefore you might pay more, but they don't get anything more back. They just have worked out a deal with the providers, which is less. That is correct, Your Honor. That's why we have the Penny Cox declaration where she goes back and says, you know, they should be entitled to get back the amount that they paid under the contract, but here that was approximately $6,000, but here they took back more than that amount, and for that reason, Your Honor, you have that overabundance where we have had to pay twice as much, not just the contract price, but we paid back more because the accounting from the Everett Clinic says, oh, we gave back to Premier $15,000, and we're subject to that. So your analysis is correct, Your Honor, where you say that, you know, it's a reduced amount. Unfortunately, the provider said this is the amount that we gave back to Premier, and you have to repay us $15,000 plus interest, which was the $16,000. I'll look at that. Thank you, Your Honor. In addition, Your Honor, the so you really don't dispute, I guess, the plan language at page 41 where it says we have the right to recover amounts we pay that exceed the amount for which we're liable. Such amounts may be recovered from the subscriber or any other payee, or such amounts may be deducted from future benefits. No, in fact, I use that, Your Honor, because it talks about the excessive amounts. The excessive amounts, when you talk about exceeding, the only other amounts that they talk about exceeding and where they've provided benefits is under the UAM carrier, and so when you go back to that time and you take a look at the exceeding amounts, it still is a question of fact. How much can they take back under the amounts that exceed the amount that they're liable? There's no determination by the lower court saying what amounts are you liable, so it would be referenced back saying you're liable for this amount. Unless you use your argument saying $10,000, then it's a question of fact that they took back more than the $10,000 based on our declarations, so that becomes another issue of fact that should go back to the district court, Your Honor. With that, Your Honor, that's the basis. It is a form that you've obviously had experience with. It's like a declaratory judgment where you take a look at the contract. You see how it's been applied. Our suggestion has been applied overreaching, that under the contract there's no direction given to us as how to take the monies back or how to go about it. We kept asking. If you look at it, we wrote to their subrogation department. It's the one that corresponds to us throughout this, saying your subrogation amount is this, which would cause the common reader of this to look at the subrogation provision and say, well, okay, you have to be made whole. There's no directed information to go to the PIP coverage or says where it's not applicable. It says we are asking, and this will be credited against your account. We even asked for an appeal with Premier rather than Calypso, saying, look, this is an urgent appeal. You're going to take this money back. We want to have this addressed. We get a letter back from Premier, or excuse me, from Calypso that you see at 176, saying this is not a discretionary review. You owe the money, and we're saying, well, hold on here until we get this thing resolved. They didn't hold on. They continued to take money back, and that's why we got into the situation where my client, who should have easily been able to resolve this thing, is ending up being responsible for $72,000, Your Honor, on a $10,000 claim. So it's greater. It may not be as significant as the parties that you heard before us in this argument, but $72,000 for a working man who lost four months of wages and was out of work that long is a tremendous amount of money, Your Honor. So I thank you for this opportunity. Okay. Thank you. If it please the Court, my name is Gwendolyn Payton, and I'm counsel for Primera Blue Cross and Calypso. If that's too high, you can lower it. Yeah, I can. It's a little high. It's up to you. I can see you better now. Well, I can barely see your glasses, so I thought you may want to lower it. Well, the problem with putting it low is then I have to lift it up to see. Okay. But I think I found the perfect balance here. Your Honors, the Court should uphold the district court, as the district court states in its opinion and in its order denying reconsideration that the plain language of this policy is clear and it does not support the plaintiff's position. Here are the relevant uncontested facts that are in the record. There's been some discussion today of some things that are outside the record, for example, $73,000 in medical expenses, never been submitted in any evidence before the Court. But that aside, here is what is in the record and what the Court needs to focus on to affirm the order of summary judgment. First, the plaintiff was injured. He had medical services, and Primera reimbursed those services at the contracted rates directly to the provider. This is not a coverage dispute. This is not a dispute about $73,000 in medical benefits not being paid. This is about one bill from the Everett Clinic. The plan document is clear. It says that benefits are not available when you have PIP. He had PIP. What it says, I think, is that Primera will pay the medical expenses exclusive of any recovery under PIP. Is that right? Yes. So they paid all the medical expenses unaware, I guess, that there were PIP benefits which had been paid to Mr. Cooper. I'm not sure at what point in the process they became aware that there was PIP. They knew certainly that this was arising out of an accident, usually PIP. When they became aware and they said, okay, Mr. Cooper, you received these PIP payments, and we paid the full amount that we were supposed to pay of your medical expenses, including the PIP money which you got. Right. So pay us back the PIP money. And he said no. He said no. So then they said, well, we'll just take a credit from the supplier, and they got a $10,000 credit from the supplier, the medical supplier. Correct. Who then added that $10,000, the amount that's owed to them by Mr. Cooper, I think. Is that right? Well, no, now Mr. Cooper owes the provider directly. He owes the provider directly the $10,000 that the provider credited back to the insurance company. Correct. Is that right? Yes. And that's where we are. That's where we are. And that's what the insurance policy provides for. It does, explicitly. What else have you got to argue? Well, I don't think I have actually anything left to argue. It's pretty straightforward. I can address, though, and respond to the arguments that plaintiffs have made, and I did want to briefly mention that $16,000, $10,000, just to make sure we're clear on that. You've got a special contract with the medical provider. Well, it does arise from the provider contract, but it's also in the plan document that we have in front of us here that it says, if we have an overpayment, we will take it back, if necessary, from the provider. So it's in two different places. And nobody has contested that part of the transaction here. So, yes, these letters go out, say, pay us back, and, in fact, we'll work with you. If you somehow already paid the money to the provider directly, let us know. We'll try to figure out. That doesn't happen. What happens is Primera gets sued in state court under state law, alleging punitive damages, et cetera, relating to this take-back. So let's talk just briefly about the arguments that are before you. I think that the lead argument in the appellant's brief now is this argument about the timing of the take-back versus the recovery of the PIP. So the argument, as I understand it, says that under the language of that PIP exclusion, if for some reason happenstance occurs that the PIP money comes in from the other carrier after the medical benefits have been paid, you plan are out of luck because of the way that the language is. Now, I want to emphasize what Your Honor asked about ambiguity in the plan document. That has never been argued really to any court that this language is ambiguous. It's not in any of the lower court pleadings from Mr. Cooper. And, indeed, if you look at the very first entry in the reply brief before Your Honors, the argument is that this plan language is unambiguous. This is not an ambiguity case. So I think that the district court's order speaks fairly eloquently to the incongruity of the result, even if that's what the language implied, and I submit to you the language is very clear, that it doesn't matter when the PIP recovery comes in. That would be a very perverse result because it would encourage plans not to pay medical benefits promptly to the provider as they come in, and it's certainly not a result that anybody would want to do. This is a case where the plan has done everything right and actually gone above and beyond to work with the member to avoid any result to the member that would be adverse. The other argument has been, in opposition to the plan's action, has been this argument really about subrogation and made whole, and really pointing to two separate and distinct parts of the plan document, the one that deals with UIM. This just isn't UIM recovery. It's just a different beast than that. And then there's a general subrogation provision in the policy that deals with third-party recovery. Again, not this situation. This is a contract exclusion. It puts another source of insurance, primary, in the health benefit plan, secondary. It's very common. It happens all the time. Primero was not seeking a subrogation interest in this case from the recovery of the personal injury benefit with respect to the PIP money. They certainly would have had a subrogated interest for the amounts paid above and beyond the PIP, which, you know, it was a negligible amount of money. But we're confusing apples and oranges when we talk about that subrogation provision. And I didn't hear any argument about that today. Okay. So it boils down to this, and I can conclude. The policy excludes any amount that is covered by PIP. The policy explicitly states that if the plan overpays, it will do a take-back from the provider if necessary. Primero sent at least two letters to counsel, who was representing this member, and asking him to pay back the PIP and or account for the payment of the PIP money. And Primero did go back and recover the $10,000 from the provider. Is there anything in this record which would suggest Primero got more than $10,000? Oh, thank you for reminding me, Your Honor. That's the only issue I thought you were going to talk about as my colleague got through asking his pretty straight question. Right. Sorry. It's hard for lawyers not to talk. I'm sure you appreciate. But, no, the record is really very clear that it was a $10,000 take-back. It's only the first time that there became allegations otherwise was in Mr. Cooper's motion for reconsideration on the order granting summary judgment. And if you look in the record at ER 1 and 2, it's Judge Lasnik's order on the motion for reconsideration. And he deals with that issue pretty explicitly and goes through some of the details. And the salient point, I think, is Ms. Cox, who submits the declaration and essentially just states that they did $16,000 worth of take-back versus $10,000, is not an employee of the Everett Clinic, although reading the first line of her declaration, you might be inclined to believe that because it says, I have worked with the Everett Clinic for a long time. She is, in fact, an employee of the law firm who is representing Mr. Cooper. And she says, I've gone through these records and here they are. And as Judge Lasnik notes in his order, it really doesn't say that. In fact, the only possible evidence in the record is Ms. Cox's declaration, and he makes a finding that, in fact, the records don't show that at all. If the insured had given the $10,000 back to Primera, any insured's debt to the Swedish hospital would have been obliterated. Is that correct? That is correct. The obligation would have been discharged in full. I think one of the complaints is, well, now there is some debt left, and they may not get the discounted rate that Primera was able to get. But that's perhaps the cost of the mistake. That was the consequences of something that was completely avoidable, correct? I mean, the record isn't actually all that clear on that. I recognize that. There's interest, there's co-pays. But, yes, that was a foreseeable risk of not working with the plan, which has negotiated rates. Thank you. Thank you, Your Honors. Thank you both. Case 0835535, Cooper v. Primera, Blue Cross, has now been submitted. Thank you, counsel, for your argument. We appreciate you both. This court is now adjourned. This court for this session stands adjourned.
judges: Canby, Thompson, Smith N. R.